MISSISSIPPI POULTRY
ASSOCIATION, INC.,
et al., Plaintiffs,

v.

Edward R. MADIGAN, Secretary of the
United States Department of Agriculture, et al., Defendants.

Civ. A. No. J91–0086(W).

United States District Court,
S.D. Mississippi,
Jackson Division.

April 28, 1992.

Hubbard T. Saunders, IV, William J. Cole, III, Jackson, Miss., Gary Jay Kushner, William A. Bradford, Jr., Washington, D.C., for plaintiffs.

Office of U.S. Atty., Jackson, Miss., Thomas W. Millett, Gretchen E. Jacobs, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court are the cross-motions for summary judgment in the above styled and numbered cause filed by the plaintiffs and defendants pursuant to Rule 56(c)[1]. The precise question presented to this court is whether an administrative regulation which governs the importation of foreign poultry products into the United States promulgated by the Food Safety and Inspection Service, an agency of the Department of Agriculture, faithfully and properly applies the Poultry Products Inspection Act [hereinafter PPIA], 21 U.S.C. § 451, et seq.,[2] as amended by Section

---

1. Rule 56(c) provides in pertinent part:

The motion shall be served at least ten days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

2. Title 21 U.S.C. § 451, et seq., is styled "Poultry Products Inspection." The Congressional statement of findings is found in § 451 which states:

Poultry and poultry products are an important source of the Nation's total supply of food. They are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce. It is essen-

tial in the public interest that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers. It is hereby found that all articles and poultry which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce, and that regulation by the Secretary of Agriculture and cooperation by the States and other jurisdictions as contemplated by this

1701(a) of the Food Security Act of 1985 [hereinafter 1985 Farm Bill]. Defendant's regulation states that foreign inspection systems dealing with the slaughtering and processing of poultry products must provide inspection, sanitation, quality, species verification and residue standards to imported foreign poultry that are "at least equal to" those applied to American domestic poultry products. Plaintiffs, Mississippi Poultry Association, Inc., and the National Broiler Council, contend that the administrative regulation is arbitrary and capricious and that the defendants exceeded their statutory authority by improperly applying and enforcing the mandates of the 1985 Farm Bill relating to the inspection standards imposed on imported foreign poultry. Specifically, plaintiffs argue that the "at least equal to" standard adopted by the Department of Agriculture is contrary to the language of the PPIA, 21 U.S.C. § 466(d) (Supp.1991) (codified version of § 1701(a) of 1985 Farm Bill) which states that all poultry and poultry products imported into the United States shall be subject to *the same* inspection standards applied to poultry produced in the United States and must be processed in facilities and under conditions *the same* as those under which similar products are produced in the United States. (emphasis added) Plaintiffs contend that Congress did not intend the "at least equal to" standard because such a standard would allow for subjective evaluation of foreign poultry requirements, would permit standards less than those in the United States, and would create an unfair competitive advantage for foreign poultry producers. Hence, plaintiffs request a declaratory judgment that the "at least equal to" standard imposed by the defendants' regulation is unlawful, unenforceable, and in contravention of the clear, unambiguous mandate from Congress that foreign inspection systems employ "the same" inspection standards applied to poultry produced in the United States.

Defendants disagree with the contentions of the plaintiffs, that the language of the PPIA, as amended by the 1985 Farm Bill, unambiguously conveys Congress' intent. Rather, defendants contend that the language in 21 U.S.C. § 466(d), which governs the inspection standards applicable to imported foreign poultry, is ambiguous. Since the statute is ambiguous, say defendants, due deference must be given to the Department of Agriculture's rule-making authority and the "at least equal to" standard adopted by the administrative agency, which, argue defendants, is a rational and reasonable interpretation of Congress' intent.

Having considered the motions of the parties, memoranda in support of the motions, pleadings, and affidavits, together with other documents and exhibits filed, and having heard oral arguments of counsel on the matter on February 11, 1992, the court is persuaded by the plaintiffs' arguments and finds that the plaintiffs' motion for summary judgment is well taken and should be granted, there being no genuine issue of material fact. The court's findings and juridical reasonings are set out below.

## JURISDICTION

This lawsuit arises under the laws of the United States and under an Act of Congress. The regulation in issue was promulgated pursuant to the Poultry Products Inspection Act, 21 U.S.C. § 451, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* Hence, jurisdiction before the court is predicated upon 28 U.S.C. § 1331[3] and § 2201.[4] Venue is proper un-

---

chapter are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers.

**3.** Title 28 U.S.C. § 1331 states as follows:
The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**4.** Title 28 U.S.C. § 2201 provides in pertinent part:
(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration

der 28 U.S.C. § 1391(e)(3).[5]

## PARTIES

The Mississippi Poultry Association, Inc., plaintiff, is a non-profit corporation incorporated, organized, and existing under the laws of the State of Mississippi, representing its members, poultry producers and processors in the State of Mississippi, and is an interested party pursuant to 28 U.S.C. § 2201.

The National Broiler Council, plaintiff, is a non-profit corporation incorporated, organized, and existing under the laws of the State of Virginia, representing its members, producers and processors of broiler/fryer chicken throughout the United States, and is an interested party pursuant to 28 U.S.C. § 2201.

Defendant Edward R. Madigan is the Secretary of Agriculture and the senior officer in the United States Department of Agriculture.

Defendant Dr. Russell Cross is the Administrator of the Food Safety and Inspection Service (FSIS) located in Washington, D.C. Dr. Cross is the successor to Dr. Lester V. Crawford and, pursuant to Fed. R.Civ.P. 25(d)(1),[6] is substituted for Dr. Crawford as a party defendant. An agency within the United States Department of Agriculture, FSIS is charged with administering and enforcing the Poultry Products Inspection Act (PPIA). 21 U.S.C. § 451, *et seq.*

## FINDINGS OF FACT

The Food Security Act of 1985 (1985 Farm Bill) became law on December 23, 1985. Section 1701(a) of the 1985 Farm Bill amended the PPIA to provide as follows:

**(d) Domestic standards and processing facilities applicable; enforcement—**

(1) Notwithstanding any other provision of law, all poultry, or parts or products thereof, capable of use as human food offered for importation into the United States shall—

(A) be subject *to the same* inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States; and—

(B) have been processed in facilities and under conditions that are *the same as* those under which similar products are processed in the United States.

Food Security Act of 1985, Pub.L. No. 99–198, § 1701(a), 99 Stat. 1633 (codified at 21 U.S.C. § 466(d)) (emphasis added).

Prior to the statutory change in 1985, 21 U.S.C. § 466 did not provide the specific standards to be imposed on imported foreign poultry and poultry products. The old section was divided into parts (a) through (c). Part (a) stated that no slaughtered poultry or poultry products shall be imported into the United States unless:

... they are healthful, wholesome, fit for human food, not adulterated, and contain no dye, chemical, preservative or ingredient which renders them unhealthful, unwholesome, adulterated, or unfit for human food and unless they also comply with the rules and regulations made by the Secretary of Agriculture to assure that imported poultry or poultry products comply with the standards provided for in this chapter.

---

shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**5.** Title 28 U.S.C. § 1391(e)(3) states:

(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which ... (3) the plaintiff resides if no real property is involved in the action.

**6.** Rule 25(d)(1) states:

(1) When a public officer is a party to an action in an official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.

21 U.S.C. § 466(a). Part (a) further provided that all imported poultry which enters the United States in compliance with the rules and regulations of the section is treated as domestic poultry. *Id.* Part (b) authorized the Secretary of Agriculture to make rules and regulations to carry out the section and authorized the Secretary to prescribe the terms and conditions for the destruction of all slaughtered poultry. 21 U.S.C. § 466(b). Part (c) mandated that charges for storage and labor of foreign poultry refused admission to the United States be assessed against the owner or consignee. 21 U.S.C. § 466(c).

By the authority of Part (b) of 21 U.S.C. § 466, the Food Safety and Quality Service promulgated regulations prior to the passage of the 1985 Farm Bill governing the appropriate inspection standards for imported foreign poultry. In 1984 and 1985, the regulations of the Food Safety and Quality Service specifically provided that foreign inspection systems must maintain a program of supervisory visits to certified foreign establishments to assure that inspection, sanitation, and other requirements, "at least equal to" those of the Federal system of poultry inspection in the United States, are being met. *See* 9 C.F.R. § 381.196(a)(2)(iv) (1984) (inspection standards on imported foreign poultry).

So, against this backdrop, Congress enacted the 1985 amendment and added subsection (d) to 21 U.S.C. § 466. Subsection (d) not only specifies the inspection standards for imported foreign poultry, but further provides that foreign poultry will not be permitted entry into the United States if it does not meet the standards imposed by the subsection. 21 U.S.C. § 466(d)(2). Subsection (d) states that the Secretary shall enforce the subsection through random inspections and random sampling. 21 U.S.C. § 466(d)(3).

Pursuant to the statutory change in 1985, the Food Safety and Inspection Service [FSIS] published a proposed rule in the *Federal Register* on May 1, 1987. The proposed section 381.196(a)(2)(iv) of 9 C.F.R. Part 381 provided that "[T]he foreign inspection system must maintain a program to assure that the requirements referred to in this section, *at least equal to* those applicable to the Federal system in the United States, are being met." 52 Fed. Reg. 15960, 15963 (May 1, 1987) (emphasis added).[7]

On October 30, 1989, FSIS published the final rule. In the preamble to the final rule, FSIS stated that it received 31 comments about the proposed rule, with more than 75 percent of the comments opposing the proposal and all opposition objecting to the "at least equal to" standard FSIS had chosen. Included in the 24 commenters opposing the proposed rule were eight members of Congress, all of whom voted for the 1985 amendment. 54 Fed.Reg. 43948, 43950 (Oct. 30, 1989). Senator David Pryor, sponsor of the 1985 Farm Bill which enacted 21 U.S.C. § 466(d), wrote to the Secretary of the Department of Agriculture on March 27, 1987, saying:

---

7. The "at least equal to" standard adopted by the FSIS in 1987 did not differ from the standard employed by FSIS prior to 1985 despite the enactment of the 1985 Farm Bill. *Compare* 9 C.F.R. § 381.196 (1984) *with* 9 C.F.R. § 381.196 (1990). On August 8, 1986, prior to the adoption of the proposed rule, the Administrator of FSIS, Donald Houston, sent a "threshold analysis" to his department heads regarding the 1985 amendment affecting the poultry products inspection regulations. The analysis addresses specifically new subsection (d) of 21 U.S.C. § 466 and says:

FSIS considers the term "same," as used in the amendatory language, to mean "at least equal to" as currently provided for in the Federal meat and poultry products inspection regulations. A review of the legislative history of this amendment revealed that both the House and Senate bills had identical provisions requiring imported poultry products to "be subject to the same inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States." The Senate bill also contained a provision requiring imported poultry products to "have been processed in facilities and under conditions that are the same as those under which similar products are processed in the United States." The House bill contained no comparable provision. The Conference Committee substitute adopted the language of the Senate bill.

Houston concluded that his interpretation was consistent with the regulation then in effect and with the prior congressional intent.

... It is my understanding that, notwithstanding the clear language of the new poultry import requirements, FSIS plans to interpret the law to permit importation of poultry that has been prepared under conditions that are "equal to" but not the "same as" the conditions prevalent in this country. Indeed, FSIS has already proposed to certify the United Kingdom as eligible to export poultry to the United States on that basis.

As the principal sponsor of the Farm Bill amendments to the poultry inspection law, I can assure you that it was my intent that poultry produced in facilities and by procedures that do not mirror those in the United States shall not enter this country....

In the final rule's preamble, FSIS stated that, "[A]ll of the opposing commenters objected to FSIS's interpretation of the language in the Farm Bill which states that a foreign inspection system be 'the same as' the United States inspection system before product can be imported." *Id.* The Agency further stated that:

These commenters felt that the phrase should be distinguished from "at least equal to" because the latter phrase would allow for subjective evaluation of foreign country requirements, would permit standards less than those of the United States, would create an unfair competitive advantage for foreign poultry products and would result in inferior products entering the United States.

*Id.*

On November 28, 1990, the Food, Agriculture, Conservation, and Trade Act of 1990 became law. Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Farm Bill), Pub.L. No. 101–624, 104 Stat. 3359 (1990). Section 2507 of the 1990 Farm Bill provides that:

(a) FINDINGS.—Congress finds that—
(1) in 1985 the Poultry Products Inspection Act, an Act to maintain the integrity and wholesomeness of this Nation's food supply, was amended by the Food Security Act of 1985;
(2) the 1985 Amendment provided that poultry products offered for importa-

tion into the United States shall be subject to the same inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States and that such products shall have been processed in facilities and under conditions that are the same as those under which similar products are processed in the United States; and
(3) On October 30, 1989, the Secretary of Agriculture, through the Food Safety and Inspection Service, the agency in the Department of Agriculture charged with the responsibility of administering the provisions of the Poultry Products Inspection Act, promulgated a regulation implementing the 1985 amendment to that Act providing that a foreign inspection system seeking certification for export of poultry to the United States merely impose requirements at least equal to those applicable in the United States.
(b) SENSE OF CONGRESS.—It is the sense of the Congress that—
(1) the regulation promulgated by the Secretary of Agriculture, through the Food Safety and Inspection Service, with respect to poultry products offered for importation into the United States does not reflect the intention of the Congress; and
(2) to urge the Secretary, through the Food Safety and Inspection Service of the Department of Agriculture, to repeal the October 30, 1989, regulation and promulgate a new regulation reflecting the intention of Congress.

Food, Agriculture, Conservation, and Trade Act of 1990, Pub.L. No. 101–624, § 2507, 104 Stat. 3359, 4068–69 (1990).

Congress stated in the House Conference Report accompanying the 1990 Farm Bill that, although certain technical deviations, such as dye color and materials used for knives, from what is approved in the United States may be acceptable, the "fundamental inspection system, intensity, procedures, and food safety standards, ... should be the same as those prevalent in the United States for any such country to

be certified for export to the United States." H.R.Conf.Rep. 916, 101st Cong., 2d Sess. 1222 (1990), 1990 U.S.Code Cong. & Admin.News, pp. 4656, 5747.

While § 1701(a) of the PPIA employs "the same as" phrase relative to imported foreign poultry, in other sections of the PPIA dealing with states or territories, Congress did use an "at least equal to" phrase. Specifically, section 11(e) of the PPIA, 21 U.S.C. § 460(e), provides that:

... whenever the Secretary determines, after consultation with an appropriate advisory committee provided for in section 454 of this title, that the State or territory does not have *at least equal* authority under its laws or such authority is not exercised in a manner to effectuate the purposes of this chapter, ... in such case the provisions of paragraph (b), (c), or (d) of this section, respectively, shall apply to such persons to the same extent and in the same manner as if they were engaged in such business in or for commerce and the transactions involved were in commerce.

21 U.S.C. § 460(e) (emphasis added). One gleans from this that Congress has decided that states or territories must have an inspection system that is "at least equal to" that of the federal system. Failure of a state to have such a system results in that state being "designated" for federal jurisdiction and permits FSIS to regulate poultry and poultry products moving in intrastate commerce in that state.

Similarly, section 5(c) of the PPIA also allows the Secretary to designate a state and to subject all of its poultry processing facilities to federal regulation if the Secretary believes that a state has not developed or is not enforcing, with respect to processing establishments operating in intrastate commerce only, "requirements *at least equal to* those imposed under sections 451 to 453, 455 to 459, 461 to 467d ..." 21 U.S.C. § 454(c) (emphasis added). States not meeting these requirements are "designated." 9 C.F.R. §§ 381.221–.223 (1990). Thus, in providing that states must have a poultry inspection system for products moving in intrastate commerce, Congress chose a specific standard—the "at least equal to" standard.

## CONCLUSIONS OF LAW

If the plain meaning of a statute expresses Congressional intent, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). *See Norfolk & Western Railway Co. v. American Train Dispatchers Ass'n,* —— U.S. ——, 111 S.Ct. 1156, 1162, 113 L.Ed.2d 95 (1991) (if intent of Congress is clear from reading of unambiguous language of statute, courts must give effect to expressed intent of Congress); *Sutton v. United States*, 819 F.2d 1289, 1929 (5th Cir.1987) (no more persuasive evidence of purpose of statute than words by which Legislature undertook to give expression to its wishes). In short, the plain meaning of the statutory language is conclusive except in rare cases "in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In the statute before the court, the words "the same as" are not ambiguous and have a plain meaning. The "same as" phrase used by Congress in the 1985 Farm Bill does not mean "at least equal to," the language used by defendants when the defendants promulgated the final rule at issue.

In amending the PPIA in 1985 by adding a new subsection to Section 17, Congress did not choose to apply the "at least equal to" standard, which it had applied to the states, to foreign poultry products offered for import. Instead, Congress chose to establish a different standard—a "same as" standard. The use of different words or terms within a statute indicates that Congress intended to establish a different meaning for those words. *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296,

300, 78 L.Ed.2d 17 (1983); *Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 843 (D.C.Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984); *National Insulation Transportation Committee v. I.C.C.,* 683 F.2d 533, 537 (D.C.Cir.1982); *United States v. Martino,* 681 F.2d 952, 954 (5th Cir.1982), *aff'd sub nom., Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *see Russell v. Law Enforcement Assistance Administration,* 637 F.2d 354, 356 (5th Cir.1981) ("well settled rule of statutory construction that where different language is used in same connection in different parts of statute, it is presumed that Legislature intended different meaning and effect").

The court notes that when Congress enacted the 1985 Farm Bill, the Department of Agriculture through the Food Safety and Quality Service promulgated regulations governing the inspection standards applied to imported foreign poultry. These regulations adopted the "at least equal to" standard. *See* 9 C.F.R. § 381.196(a)(2)(iv) (1984). If Congress intended to change and strengthen the existing law in 1985, the defendants' interpretation of the amendment would render the Congressional statute cumulative with respect to inspection, sanitation and other standards required of imported foreign poultry since the Department of Agriculture already had in place the "at least equal to" standard. *See Miles v. Appex Marine Corp.,* —— U.S. ——, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990) (Congress is aware of existing law when it passes legislation).

This court's conclusion that Congress intended that the terms "same as" and "at least equal to" have different meanings within the PPIA is further supported by Congress' action in 1990. In the 1990 Farm Bill, Congress stated that the final rule promulgated by the Secretary in October of 1989 was different from the standard established by the 1985 amendment and did not reflect the intention of Congress. Congress unequivocally stated that "the regulation promulgated by the Secretary of Agriculture, ... does not reflect the intention of the Congress." 1990 Farm Bill, § 2507(b)(1). Congress further stated that the Secretary should "repeal the October 30, 1989, regulation and promulgate a new regulation reflecting the intention of the Congress." 1990 Farm Bill, § 2507(b)(2). Although Congressional resolutions do not have the force of law, the resolution in the matter before the court is an " ... expression of opinion on a point of law ... [that is] entitled to most respectful consideration by the courts...." *F.H.E. Oil Co. v. Commissioner of Internal Revenue,* 150 F.2d 857, 858 (5th Cir.1945). *See Butler v. United States Department of Agriculture,* 826 F.2d 409, 414 n. 6 (5th Cir.1987) (subsequent Congressional statements, although worthy of less weight than contemporaneous ones, are entitled to careful consideration as "secondary authoritative expression of expert opinion"). So, persuaded by the aforementioned points, the court sides with the plaintiffs.

In opposing plaintiffs' motion, defendants argued that plaintiffs were "slavishly devoted" to a strict identicality standard read into § 466(d) Congress never intended. According to defendants, Congress no where defines the "same as" standard and, further, that adherence to such a standard would yield anomalous and harsh results on this country's foreign policy. Therefore, argue the defendants, since the "same as" standard is ambiguous and since the defendants balanced the country's foreign trade interests and articulated a reasonable regulation under the circumstances, the defendants' actions are entitled to considerable deference and should be upheld.

Relative to the first argument, defendants contend that since Congress never specifically defines "sameness" as "identicality," that they are warranted in construing the term as "equivalent" or "comparable." However, the answer to this argument was supplied earlier: Congress in the PPIA clearly recognized a distinction in the terms "the same as" and "at least equal to." This perceived definitional distinction is evident where Congress applied the former standard to foreign imports and the latter to state domestic poultry. Hence, defendants' argument is not on target.

Defendants' second point is that a standard of identicality would affect adversely foreign policy of the United States. According to defendants, such a definitional finding would augur dire foreign trade implications and would run afoul of the sainted open and cooperative trade policy championed by the 1985 Farm Bill and other trade legislation. Defendants predict that "application of a literal 'same as' standard effectively would preclude importation of *any* foreign poultry products into the United States since no foreign inspection systems operate in precisely the same manner as American systems." Memorandum In Support Of Defendants' Cross–Motion For Summary Judgment And In Opposition To Plaintiffs' Motion For Summary Judgment, p. 19. Currently, the United States receives imported poultry products from Canada, France, Great Britain, Hong Kong, and Israel. 9 C.F.R. § 381.196(b).

Assuming, *arguendo*, that such trade implications would occur, that is a matter for Congress, not for this court. *See C.I.R. v. Asphalt Products Company, Inc.*, 482 U.S. 117, 107 S.Ct. 2275, 2278, 96 L.Ed.2d 97 (1987) (judicial perception that particular result would be unreasonable may enter construction of ambiguous provisions, but cannot justify disregarding what Congress plainly and intentionally provided); *United States v. Chen*, 913 F.2d 183, 189 (5th Cir.1990) (court construes statute according to plain meaning of words used without regard to whether statute differently framed would yield results more consistent with fairness and reason). Our hoary and time-tested constitutional scheme reposes legislative power in the Congress. The constitutional mandate to the courts, the third branch of our tripartite constitutional scheme, is to interpret laws, not to enact them. Where a law's meaning is evident and we proclaim it's so and announce its scope and intention, the court's mission is complete. The fate of the enactment then lies with Congress and the people represented by that body.

Defendants' deference argument rested on the shoulders of their ambiguity argument. Because the court finds that "the same as" language is unambiguous and clearly conveys Congressional intent, no deference need be given a differing interpretation of the language by the defendants. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Given the foregoing, the court finds that Congress intended to strengthen the PPIA with respect to the standards applying to foreign poultry imported into the United States.[8] The court finds that the interpretation of the statutory language urged by the defendants would allow more discretion than Congress intended by both foreign and United States Department of Agriculture officials in decisions as to whether the foreign poultry met lawful standards.[9] The interpretation urged by the defendants permits subjectivity in such decisions, which the court finds that Congress did not intend.

For these reasons, the court concludes that since there are no genuine issues of material fact, plaintiffs are entitled, as a matter of law, to declaratory judgment that Subsection 381.196(a)(2)(iv) of Title 9 of the Code of Federal Regulations, 9 C.F.R. § 381.196(a)(2)(iv), is invalid and unenforceable. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (a case is ripe for summary judgment under Rule 56 of Federal Rules of Civil Procedure when there are no genuine issues of material facts and when under the law the moving party is entitled to a judgment). Accordingly, the court grants plaintiffs' motion for summary judgment and denies defendants' cross-motion for

---

8. The Senate Report accompanying the Senate Bill does state that the Bill's purpose is to "strengthen" the law regulating the importation of poultry or poultry products. S.R.Rep. No. 99–145, 99th Cong., 1st Sess. 2005–06 (1985).

9. The defendants readily acknowledge that the "at least equal to" standard admits of "some differentiation in foreign inspection systems as compared to United States systems ..." *See* Defendants' Memorandum In Support Of Defendants' Cross–Motion For Summary Judgment, p. 16.

summary judgment. A separate judgment will be entered in accordance with the rules of this court.

SO ORDERED.